JUSTICE TRIEWEILER
dissents.
¶40 I dissent from the majority’s resolution of both issues presented on appeal.
¶41 I conclude, based on that evidence most favorable to the State, that the arresting officer, Jeremy House, had no particularized suspicion of criminal activity sufficient to detain the defendant, Robert Dawson; that his discovery of illegal contraband was not the result of a protective search for a weapon; and that House’s interrogation of Dawson occurred after Dawson was forcibly detained and was, therefore, in violation of Dawson’s Fifth Amendment rights.
*223 ¶42 On the issue of whether Dawson was lawfully detained and searched, it is unnecessary to discuss Dawson’s version of events which is very different than Officer House’s version. Nor is it necessary to analyze constitutional authorities. The search was unlawful based upon Officer House’s own testimony and based on Montana’s statutory law.
f 43 First, it is necessary to set forth Officer House’s testimony. The majority opinion suggests that it was Officer House’s intent to search for weapons, but that before he did so, he asked Dawson if he had any “weapons, drugs or needles” and that in response Dawson “motioned toward his left coat pocket and said that he had some ‘smoke’ in there.”
¶44 What in fact happened, according to Officer House, was that after Dawson partially entered the room, he told the officer he was looking for Jeremy. Then, according to Officer House:
Once he was halfway in, once he was right there, I just turned him around, after we identified ourselves, and told him to put his hands on the wall so that we could search him.
¶45 House testified that once he started the search, Dawson was not free to leave the room. He also gave the following testimony regarding the sequence of events which led to the discovery of the contraband on Dawson’s person:
Q. And then you did not advise him of his Miranda warning before you asked him whether he had weapons or syringes or drugs on his person—
A. He was not under arrest.
Q. —when you searched him?
A. I patted him down. And once he motioned to his upper left-hand coat pocket, I searched that coat pocket.
Q. You searched it because he told you he had smoke in there, and you thought smoke meant drugs?
A. Correct.
Q. You weren’t searching that pocket for officer safety at this time then?
A. No.
Q. Did you find any guns, knives or weapons on him?
A. No.
Q. Okay. You found drugs in the pocket where he told you you’d find drugs, correct?
A. Correct. I believe they were in a black pouch inside the pocket.
*224 ¶46 Furthermore, although the majority goes to some length to discuss facts which in the majority’s opinion could have given rise to a particularized suspicion of criminal activity, it is clear that at the time House detained, searched, and questioned Dawson, he had no particularized suspicion that Dawson had engaged in criminal activity. He gave the following answers to the following questions at the suppression hearing:
Q. Was he actually a suspect in any known crime at this time?
A. Not at that time.
Q. Okay. You had no articulable suspicion that he had engaged in any type of criminal activity?
A. No.
Q. You had no reason to believe that he was involved in any of the activity that Mr. Roehr was involved in?
A. I was unsure.
Q. You were unsure, but you had no reason to believe that he was then?
A. Correct.
¶47 Section 46-5-401, MCA, sets forth the only statutory basis for detaining Dawson under the circumstances in this case. It required that he be “observed in circumstances that create a particularized suspicion that the person... is committing, or is about to commit an offense.” By Officer House’s own admission he had no such suspicion and therefore, his detention of House was unlawful.
¶48 Section 46-5-402, MCA, is the statutory authority relied on by the majority to justify Officer House’s frisk and search of Dawson. However, the applicability of § -402 is conditioned upon a lawful stop pursuant to § -401. For the reasons set forth in the preceding paragraph, Dawson was not lawfully stopped or detained. Furthermore, § -402 provides that a person may be frisked if lawfully stopped for protection “if the officer has reasonable cause to suspect that the person is armed and presently dangerous to the officer or another person present”; however, by Officer House’s own admission, by the time he searched the pocket where contraband was found, he had already patted Dawson down and concluded that he had no weapon. The pocket where contraband was found was not searched for a weapon. It was searched for illegal drugs. Finally, § -402 does not permit the investigating officer to take possession of illegal drugs if they are found. Subsection (2) permits the officer to take possession “of any object that is *225 discovered during the course of the frisk if the officer has probable cause to believe the object is a deadly weapon.” There is no other authority to take possession of anything found as a result of the frisk.
¶49 For these reasons, I conclude that the detention and search of Dawson was unlawful. There was no particularized suspicion of unlawful conduct to justify his detention and there was no suspicion that a weapon would be found when the pocket was searched where the contraband was located.
¶50 The majority and concurring opinions suggest that further authority for the search of Dawson’s person is found at § 46-5-228(2), MCA, which allows officers to search a person entering premises where a lawful search is being conducted “for self-protection.” However, for the reasons previously mentioned, Dawson’s pocket was not searched for Officer House’s “self-protection.” It was searched after he had already patted down Dawson and concluded that he was unarmed for the purpose of retrieving illegal contraband. Therefore, neither does § 46-5-228(2), MCA, justify the search of Dawson’s person.
¶51 Finally, I disagree with the majority’s conclusion that Dawson was not in custody at the time he was asked whether he had drugs in his possession. In State v. Rushton (1994), 264 Mont. 248, 255-56, 870 P.2d 1355, 1359-60, we stated that:
To determine if a custodial interrogation has occurred, this Court considers each case on a case-by-case basis and looks to whether a “reasonable person” would not feel free to leave after considering such factors as the time and place of interrogation, the length and mood of interrogation, and persons present during the questioning.
¶52 Obviously, a “reasonable person” would not have felt free to leave at the time Dawson was asked the question which produced the response that he had “smoke” in his pocket. He had partially entered a motel room when he was forcibly turned around by a person who had identified himself as a police officer and told to place his hands against the wall. He had been patted down for weapons and was then asked again whether he had drugs in his possession. Officer House himself gave the following response to the following question when asked whether Dawson was free to leave during the search:
Q. So he could have just turned around and walked away, you’re telling us?
*226 A. Once I started the search, no. Once he entered the room and just stated he was looking for Jeremy and he wanted to leave, he could have left anytime he wanted to.
¶53 Aside from the fact that House previously testified that Dawson had been forcibly turned around and told to put his hands up against the wall when he was only partially into the room, it is clear that once that act had occurred he was not free to leave the room. It is equally clear that only after that point in time was he questioned about whether he had drugs in his possession. For these reasons, the interrogation which produced the incriminating statement was custodial, and because Dawson had not been previously advised of his right to remain silent as required by Miranda v. Arizona (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, his statement and the evidence which resulted from that statement should have been suppressed.
¶54 Therefore, I dissent from the majority opinion. I would reverse the District Court’s refusal to suppress the evidence gathered from the defendant as a result of his unlawful detention, unlawful search, unlawful interrogation, and the unlawful seizure of the evidence found on his person.
JUSTICE HUNT joins in the foregoing dissent of JUSTICE TRIEWEILER.